UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

S.M. and L.C., individually and on
behalf of L.C. a minor

        Plaintiffs,

v.                              Case No:   2:14-cv-237-FtM-38CM

HENDRY COUNTY SCHOOL
BOARD,

        Defendant.

_____

## REPORT AND RECOMMENDATION[1]

    S.M., individually and on behalf of her minor child, L.C., has filed this action

pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1400

*et seq.*; sections 1003.57, 1003.571, 1003.573 of the Florida Statutes; Florida

Administrative Code 6A-6 *et seq*; and Section 504 of the Rehabilitation Act, 29 U.S.C.

§ 794 *et seq.*   Doc. 1.   S.M., asserts three counts on behalf of L.C.; (1) denial of free

appropriate public education ("FAPE") by the Hendry County School Board (the

"HCSB"), in violation of the IDEA; (2) denial of FAPE by the HCSB, in violation of

Florida law; (3) discrimination and the failure to provide FAPE by the HSCB, in

violation of Section 504.   Doc. 1 at 1-21.[2]   S.M., individually, asserts a claim of

---

[1] A party has fourteen days from this date to file written objections to the Report and
Recommendation's factual findings and legal conclusions.   A party's failure to file written
objections waives that party's right to challenge on appeal any unobjected-to factual finding
or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th
Cir. R. 3-1.

[2] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents
or Web sites. These hyperlinks are provided only for users' convenience. Users are cautioned

retaliation pursuant to Section 504.   *Id.* at 21-23.[3]

At the Court's direction, the parties filed a case management report with regard to Count I only, and the Court issued an IDEA case management and scheduling order ("CMSO").   Doc. 34; Doc. 35; Doc. 37.   Pursuant to the Court's IDEA CMSO, the parties filed the record from the Division of Administrative Hearings (the "DOAH") and filed under seal the admitted exhibits.   Doc. 31; Doc. 39.[4]   Additionally, in compliance with the CMSO, the parties filed their proposed findings of fact and conclusions of law.   Doc. 40; Doc. 41; Doc. 42; Doc. 43.   Further, at the Court's direction, the parties filed additional briefing addressing the Supreme Court's recent opinion in *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017).   Doc. 46; Doc. 47.   Based on review of the entire file,

---

that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

[3] The Amended Complaint also asserts a claim for relief under the Civil Rights Act, 42 U.S.C. § 1983; however, the Court dismissed the claim without prejudice.   Doc. 1 at 23-25; Doc. 23.

[4] In reviewing the hearing transcript, the Court notes that the parties failed to file several exhibits that were admitted at the final administrative hearing.   Tr. 41 (Doc. 31-1 at 41) (Exhibit 93); Tr. 3338 (Doc. 31-3 at 66) (Exhibit 114); Tr. 350 (Doc. 31-3 at 78) (Exhibit 115); Tr. 670 (Doc. 31-5 at 11) (Exhibit 105); Tr. 1080 (Doc. 31-7 at 140) (Exhibit 55); Tr. 1094 (Doc. 31-7 at 154) (Exhibit 59); Tr. 1344 (Doc. 31-10 at 12) (Exhibit 8); Tr. 1392 (Doc. 31-10 at 60) (Exhibit 22).   Nevertheless, without compromising the efficacy of this Report and Recommendation, the Court relied on the witnesses' discussion of the exhibits and the relevant website for the Florida Department of Education Technical Assistance Paper exhibits (Doc. 39-1 at 4-5) admitted but omitted.   "Tr." refers to the transcript of the administrative hearing held at DOAH, which the parties filed with the Court (Doc. 31).   The transcript is ten volumes and contains 1467 pages.   Each volume was filed as a separate exhibit to Plaintiff's Notice of Filing Hearing Transcript, Doc. 31.   For ease of access through the hyperlinks, the Court also cites to the CM/ECF document and page number.

including the record from the DOAH and the exhibits provided, the parties' proposed findings of facts and conclusions of law, the parties' supplemental briefs, the applicable law, and with consideration of the appropriate deference to be given to the decision of the Administrative Law Judge ("ALJ"), the undersigned issues the following Report and Recommendation.

## I.  Preliminary Statement

The Administrative Law Judge ("ALJ") held a five-day final hearing, during which L.C. presented the following witnesses: S.M., L.C.'s parent; Alice O'Connell ("Ms. O'Connell"), a home health care nurse who had worked with L.C.; Trina Puddlefoot ("Ms. Puddlefoot"), S.M's work supervisor; Jeff Caulkins ("Mr. Caulkins"), HCSB's former exceptional student education ("ESE") director; Caroline Bevington ("Ms. Bevington"), a physical therapist who had worked with L.C.; Kim Samuels ("Ms. Samuels"), a former school counselor who had worked for the HCSB; Kimberlee Scheetz, a music therapist who had worked extensively with L.C.; Carol Olson ("Ms. Olson"), a speech-language pathologist who had worked for the HCSB from 2010-2013 and was familiar with L.C.; Renee Terrasi, Ph.D. ("Dr. Terrasi"), the director of Peace by Piece, a private school L.C. attended for the school year 2012-2013; Britt Stroud, M.D. ("Dr. Stroud"), a pediatric neurologist with Lee Physician's Group; Jennifer Fletcher ("Ms. Fletcher"), an ESE paraprofessional who worked with L.C.; Travern Beerom ("Ms. Beerom") a school psychologist employed by the HCSB; and Lucinda Kelley ("Ms. Kelley"), the HCSB's then-current ESE director.

The HCSB presented the following witnesses: Merrill Winston, Ph.D. ("Dr.

Winston"), an expert in behavioral analysis; Ms. Kelley; Kristina Puletti ("Ms. Puletti"), a speech-language pathologist employed by the HCSB; and Bonnie Feickert ("Ms. Feickert"), L.C.'s then-current teacher at the middle school.   The vast majority of the evidence presented at the final hearing and relied upon by the ALJ was offered by Plaintiffs.   Although the ALJ did not cite to the record when making his findings, the record does fully support his findings.   Accordingly, the undersigned gives great deference to the ALJ's findings.

## II.   Facts

As of the hearing dates, L.C. was an eleven-year-old child with disabilities who was attending sixth grade in LaBelle Middle School in the Hendry County School District ("HCSD").   Doc. 1-1 ¶ 1;[5]   Doc. 41-1 at 23 ¶ 1.   L.C. qualified as a child with a disability based on the exceptionalities of Orthopedically Impaired, Speech Impaired, Physically Impaired, Occupationally Impaired, and Other Health Impaired.   Doc. 1-1 ¶ 2; Doc. 41-1 at 23 ¶ 2.

L.C. was born prematurely.   Tr. 24 (Doc. 31-1 at 24).   He was born with holoprosencephaly, a severe brain disorder where portions of the brain do not develop properly.   Doc. 1-1 ¶ 3; Tr. 28-29 (Doc. 31-1 at 28-29).   As a result, he is missing a portion of the brain known as the corpus callosum, which is responsible for communication between brain hemispheres and the transfer of motor, sensory, and cognitive information.   Doc. 1-1 ¶ 3; Tr. 29, 967 (Doc. 31-1 at 29; Doc. 31-7 at 27).   Consequently, L.C. does not communicate vocally, except through grunts and laughs,

---

[5] The Final Order was filed as an exhibit to the original complaint, Doc. 1-1.   For ease of access through the hyperlink, the Court cites directly to the CM/ECF document.

and has poor gross and fine motor skills.   Tr. 45 (Doc. 31-1 at 45).   L.C. also suffers from cerebral palsy and spastic quadriplegia, which further affect his motor skills and ability to communicate.   Tr. 34-35, 41 (Doc. 31-1 at 34-35, 41).

L.C. also was born with hydrocephalus, a condition where fluid accumulates in the brain, causing abnormal pressure and brain damage.   Doc. 1-1 ¶ 4; Tr. 359 (Doc. 31-3 at 87).   As a result, L.C. has a surgically installed shunt system to drain the excessive fluid.   Doc. 1-1 ¶ 4; Tr. 965 (Doc. 31-7 at 25).   Moreover, L.C. suffers from impaired vision measured at 20/140 in both eyes.   Doc. 1-1 ¶ 4; Ex. 76 HFSH000286 (Doc. 39-2 at 84).[6]   He wears glasses, which improve his vision, but his vision nonetheless remains limited.   Doc. 1-1 ¶ 4; Ex. 1 HFSH000021 (Doc. 39-1 at 21).[7]

Because L.C.'s ability to communicate and interact in a social fashion was below his expected level of functioning, he also was diagnosed with autism.   Tr. 968 (Doc. 31-7 at 28).[8]   As described by several witnesses, L.C. exhibits autistic behaviors such as: lack of eye contact, lack of communication, rocking back and forth, putting his hand in his mouth, and "self-stimulation behaviors where he [takes] his hands up high and wave[s] his hand[s] in a side to side motion."   Tr. 701, 760, 808

---

[6] Plaintiffs' and Defendant's Exhibits were filed in consecutive order.   Doc. 39.   The Court cites to the Exhibit number, bates number, and, for ease of access through the hyperlinks, directly to the CM/ECF Document and page number(s).

[7] At the hearing, S.M. testified that L.C. can see about forty to fifty feet with his glasses.   Tr. 292 (Doc. 31-3 at 20).   At the August 29, 2013 IEP meeting, the team discussed that L.C.'s vision when he wears glasses is limited to about three feet in front of him.   Ex. 1 HFSH000021 (Doc. 39-1 at 21).

[8] Autism is a developmental disorder "affecting verbal and nonverbal communication and social interaction," and is generally marked by "engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences."   34 C.F.R. § 300.8.

(Doc. 31-5 at 42; Doc. 31-5 at 101; Doc. 31-5 at 149).[9]   Dr. Stroud testified however, that autism describes the behavior in individuals, but not the cause of such behavior. Tr. 972 (Doc. 31-7 at 32).   He further testified that L.C.'s behaviors and skills deficits were caused by his medical diagnoses, including the holoprosencephaly and the hydrocephaly.   *Id.*

L.C.'s medical diagnoses impact every aspect of his day.   Tr. 965-66 (Doc. 31-7 at 25-26).   For instance, L.C. has difficulty grasping and holding small objects, walking independently, and switching himself from a lying to a sitting position.   Tr. 41-45 (Doc. 31-1 at 41-45).   Thus, L.C. requires daily assistance for most life activities, including toileting, eating, communication, walking, and transportation. Doc. 1-1 ¶ 8; Tr. 51, 313, 670, 716 (Doc. 31-1 at 51; Doc. 31-3 at 41; Doc. 31-5 at 11; Doc. 31-5 at 57).   L.C. has an adapted stroller, which is used to transport him to and from the school bus and between his classrooms.   Tr. 58, 408-10, 1370-71 (Doc. 31-1 at 58; Doc. 31-3 at 136-138; Doc. 31-10 at 38-39).   In October 2010, the HCSB purchased a KidWalk for L.C. to help him ambulate independently within the classroom.   Ex. 23 HFSH000128-131 (Doc. 39-1 at 129-131).[10]

L.C. is able to communicate on a limited basis through the use of sign language

---

[9] The foregoing testimony was provided by Ms. Sheets, who had worked with L.C. for approximately five years, Tr. 757 (Doc. 31-5 at 98), Ms. Samuels, who had specialized training in autism, Tr. 701 (Doc. 31-5 at 42), and Ms. Olson, who had worked with L.C. from September 2010 to March 2012.   Tr. 808 (Doc. 31-5 at 149); Ex. 111 HFSH000338-341 (Doc. 39-2 at 138-141).

[10] KidWalk is a posturally supportive mobility system that straps to the child's chest and abdomen and has two large wheels and four small wheels to assist the child in maneuvering while keeping his hands free.   Ex. 23 HFSH000128 (Doc. 39-1 at 128).   It can also lock in place, allowing the child to stay seated without additional support.   Tr. 1422 (Doc. 31-10 at 90).

or hand signals that approximate sign language.   Tr. 47 (Doc. 31-1 at 47).[11]   L.C. also is able to communicate on a limited basis through the use of an iPad.   Tr. 49-50 (Doc. 31-1 at 41-50).

L.C. began his enrollment with HCSD as a homebound student.   Doc. 1-1 ¶ 8; Tr. 71 (Doc. 31-1 at 71).   In 2008, he began attending school when he enrolled in first grade in the classroom of Marianne Torgler ("Ms. Torgler").   Doc. 1-1 ¶ 9; Tr. 72 (Doc. 31-1 at 72).   Upon his enrollment, on October 8, 2008, Catherine Moon, Ph.D., conducted a psycho-educational evaluation of L.C. on behalf of the HCSD.   Doc. 1-1 ¶ 10; Ex. 15 HFSH000089-95 (Doc. 39-1 at 89-95).   Dr. Moon observed L.C. in his classroom for 60 minutes and reviewed a Vineland II-Adaptive Behavior Scale survey form completed by L.C.'s mother.   Ex. 15 HFSH000091-95 (Doc. 39-1 at 91-95).[12] Dr. Moon attempted to perform an IQ test, the Leiter-R, and the School Readiness Composite of the Bracken-R, which measures basic concept acquisition and receptive language skills, but was unable to complete them because L.C. had difficulty understanding the tasks despite demonstration and instruction from both his mother and the psychologist.   *Id.*; Tr. 1114 (Doc. 31-7 at 174).

Dr. Moon recommended that L.C. participate in an inclusion classroom for some time each day;[13] L.C.'s classroom instructions be supplemented with one-on-

---

[11] Because of his limited fine motor skills, L.C. is not able to manipulate his fingers to the extent required to perfectly sign words in sign language.   Tr. 75 (Doc. 31-1 at 75).
[12] The Vineland II-Adaptive Behavior Scale is a parent survey.   Tr. 1021 (Doc. 31-7 at 81).   Dr. Moon's report states the Vineland II was administered to provide a baseline for L.C.'s future progress.   Ex. 15 HFSH000094 (Doc. 39-1 at 94).
[13] An inclusion classroom is a classroom that contains students with disabilities and general education students.   Tr. 1147 (Doc. 31-8 at 12).

one instruction; and L.C. be referred to Assistive Technology to determine what augmentative and/or alternative communication devices might improve his ability to communicate.   Ex. 15 HFSH000094 (Doc. 39-1 at 94).   She also made three other recommendations that would be helpful for L.C.: a classroom aide working with L.C. on a daily basis using activities recommended by the physical and occupational therapists; computer programs adapted to L.C.'s physical limitations in teaching him primary-level activities such as matching items and picture vocabulary; and coordination among staff to ensure consistency in L.C.'s training.   Ex. 15 HFSH000094-95 (Doc. 39-1 at 94-95).

Early Individualized Education Plans ("IEPs") prepared for L.C. reported that he had significant abilities.   L.C.'s February 2, 2009 IEP states that he "knows 15 words from Meville to Weville curriculum by pointing to cards and on paper. He knows numbers and concepts up to 20. He knows money by name and value. He does simple addition and subtraction up to 10."   Ex. 63 HFSH000237 (Doc. 39-2 at 37). L.C.'s January 19, 2010 IEP states L.C. could:

> point to sight words when named, spell words by pointing to magnetic letters and point or answer yes or no questions about letter sounds, beginning and ending sounds about 80% correct daily. In math, he will point to numbers when named, do simple addition and subtraction up to 5, and simple patterns by point to the object or number card about 80% accuracy daily.

Ex. 62 HFSH000228 (Doc. 39-2 at 28).   This IEP also states that L.C.'s STAR reading score as related to zone of proximal development was between 1.6 and 2.6, which suggests that L.C. was reading at first grade level, although he was instructed up to

2.6 grade level.   Tr. 695; HFSH000228 (Doc. 39-2 at 28).[14]

The ALJ found, and the record demonstrates, however, that "past measurements of L.C.'s abilities in the classroom have provided inconsistent information about the student's abilities and skills."   Doc. 1-1 ¶¶ 11.   Ms. Samuels, who started working as a school counselor at L.C.'s elementary school on August 2009, testified that "some data had been presented at IEP meetings, and there was a question as to whether or not the data was reliable and valid."   Tr. 691 (Doc. 31-5 at 32).   Ms. Samuels first met L.C. on August 2009, and she "was sent in to try and figure out where he was academically."   Id.   Thus, Ms. Samuels, who completed several assessments with L.C. to determine his academic standing, opined that the information on L.C.'s 2009 and 2010 IEPs was inaccurate.   Tr. 691-96 96 (Doc. 31-5 at 32-37).   During her assessments, she never observed L.C. displaying the skills and capabilities reported in the February 2, 2009 and the January 19, 2010 IEPs. Tr. 693, 695, 699-701 (Doc. 31-5 at 34, 36, 40-42).

The reason for the inaccurate information on the 2009 and 2010 IEPs was due, in part, to assistance given to L.C. by his teacher, Ms. Torgler.   Doc. 1-1 ¶ 14; Tr. 695-99 (Doc. 31-5 at 36-40).   In taking the assessment tests, the teacher would place her hand over L.C.'s hand on a computer mouse and help him select the correct answer.   Doc. 1-1 ¶ 14; Tr. 696-97 (Doc. 35-1 at 37-38).   Furthermore, Ms. Samuels observed L.C.'s teacher using flashcards to assess L.C.'s abilities:

They were flashcards about 3X5, maybe, index-sized cards. And two

_____

[14] The STAR reading test is a computerized test which presents students with word recognition and passages that involve comprehension, and the students select the correct answer by clicking on it with a computer mouse.   Tr. 695 (Doc. 31-5 at 36).

> choices were presented to LC, and Ms. Torgler would hold the cards in such a fashion that one would be near her face, and the other one would be closer to LC. And she would ask a question, and at that time, LC's fine motor skills were not really where they should have been, and he would kind of swat. And so the one that was closer to him was within swatting distance. So he would be given credit for the correct answer.

Tr. 698 (Doc. 31-5 at 39).

The optimistic results from 2009 and 2010, which showed L.C. had significant abilities, led S.M. to request that L.C. participate in general education classes.   Doc. 1-1 ¶ 15; Tr. 701-03 (Doc. 31-5 at 42-44).   For a brief period, L.C. was mainstreamed into a first grade classroom; soon, however, he was unable to demonstrate that he understood the information being taught to him.   Tr. 702 (Doc. 31-5 at 43).   After the brief stint, it was determined that L.C. would be better served by returning to an ESE classroom.   Doc. 1-1 ¶ 15; Tr. 702-03 (Doc. 31-5 at 43-44).   The school next placed L.C. in the classroom of Hernan Serra ("Mr. Serra"), who was L.C.'s ESE teacher through Spring 2012.   Tr. 377, 702 (Doc. 31-3 at 105; 31-5 at 43).   S.M. testified that Mr. Serra "seemed to be an excellent teacher;" nonetheless, S.M. felt that he did not spend any time instructing L.C., but rather left all of that responsibility to L.C.'s personal health aide, who, S.M. believed, was unqualified to teach.   Tr. 86-89 (Doc. 31-1 at 86-89).

At a January 25, 2011 IEP meeting—in which Mr. Serra, Ms. Samuels and S.M., among others, attended—S.M. reported that she was "pleased with [L.C.'s] progress since being in the current setting . . . she believe[d] he [was] more focused, and [was] more responsive in the community."   Ex. 43 HFSH000184 (Doc. 39-1 at 184).   In contrast to his earlier IEPs, L.C.'s January 25, 2011 IEP reports that L.C.

"does not know addition or subtraction at this point" and "he is unable to identify sight words."   Ex. 43 HSFH000185 (Doc. 39-1 at 185).

During the January 25, 2011 IEP meeting, the IEP team and S.M. determined that a new evaluation of L.C. was not necessary.   Tr. 263 (Doc. 31-2 at 65); Ex. 51 HFSH000202 (Doc. 39-2 at 2).   On that date, S.M. signed an informed notice agreeing with the IEP team that a formal evaluation was not recommended.   Ex. 51 HFSH000202 (Doc. 39-2 at 2).   Although S.M. testified that she "glanced" at this document, Tr. 370 (Doc. 31-2 at 72), and it was not explained to her, Tr. 262 (Doc. 31-2 at 64), S.M. did not indicate to Ms. Samuels that she did not understand this document.   Tr. 738 (Doc. 31-5 at 79).   Moreover, S.M. understood that if a parent signs a form stating the parent agrees a further evaluation is not necessary, the school district would rely upon it.   Tr. 375 (Doc. 31-3 at 103).

In the Spring of 2012, S.M. discovered a private school called Peace by Piece, located in Lee County, Florida, which specializes in teaching functional communication to students with autism.   Tr. 264, 864-88 (Doc. 31-2 at 66; Doc. ; Doc. 41-1 at 24 ¶ 4.   Although Peace by Piece did not offer occupational therapy ("OT"), physical therapy ("PT"), and speech therapy ("ST"), S.M. liked this school because of its proximity to her home and because she felt the staff understood L.C.'s condition and would work cohesively to help L.C.   Tr. 264-65 (Doc. 31-6 at 7-8).   At this time, S.M. determined that Peace by Piece was the "best of [her] options."   Tr. 264 (Doc. 31-2 at 66).   In the Spring of 2012, S.M. approached Mr. Caulkins, the ESE director for the HCSB at that time, about enrolling L.C. at Peace by Piece.   Doc. 1-1 ¶ 16; Tr.

379, 385 (Doc. 31-3 at 107, 113).   Mr. Caulkins visited Peace by Piece and determined that it was an appropriate school for L.C.   Tr. 385, 602-04 (Doc. 31-3 at 113; Doc. 31-4 at 136).

The State of Florida provides financial assistance to qualified disabled students who wish to attend a private or out of district school that can better meet the individual student's needs.   Doc. 1-1 ¶18; Tr. 1207 (Doc. 31-8 at 72); Doc. 41-1 at 23 ¶ 3.   This financial assistance is given through a program commonly known as the McKay scholarship program.   Doc. 1-1 ¶18; Tr. 1207 (Doc. 31-8 at 72).   The determination of how much financial assistance is available for a McKay scholarship is based on an educational matrix number by the Florida Department of Education ("FDOE").   Doc. 1-1 ¶ 18, *see* Ex. 1 HFSH000026-29 (Doc. 39-1 at 26-29).   This matrix number is an evaluation of a student's specific disabilities by the student's IEP team.   Doc. 1-1 ¶ 18.; Tr. 1211-12 (Doc. 31-8 at 76-77); *see also* Ex. 1 HFSH000026-29 (Doc. 39-1 at 26-29).   While enrolled in a private school under the McKay Scholarship program, a student is not considered as enrolled in the public school district.   Doc. 1-1 ¶ 18; Tr. 1204-05 (Doc. 31-8 at 69-70).

Prior to July 20, 2012, L.C.'s funding matrix score was 254, which represented the second highest rating.   Doc. 1-1 ¶ 19; Tr. 379 (Doc. 31-3 at 107); Ex. 37 HFSH000156-163 (Doc. 39-1 at 156-63).   On July 20, 2012, Mr. Caulkins submitted a form to the FDOE increasing L.C.'s matrix rating to 255, representing the highest rating.   Doc. 1-1 ¶ 19; Ex. 37 HFSH000156-163 (Doc. 39-1 at 156-63).   On the form changing L.C.'s funding matrix number, Mr. Caulkins falsely stated that the change

was the result of an IEP meeting held on July 20, 2012, when no such meeting occurred. Doc. 1-1 ¶ 19; *See* Tr. 380-85, 624-39, 1211-12 (Doc. 31-3 at 108-113; Doc. 31-4 at 158-173; Doc. 31-8 at 76-77); Ex. 37 HFSH000163 (Doc. 39-1 at 163); Ex. 82 HFSH000298 (Doc. 39-2 at 98).

The effect of changing L.C.'s matrix rating was to increase the amount of funding that Peace by Piece received from the State of Florida under the McKay scholarship program. *See* Tr. 267, 325, 381-82 (Doc. 31-2 at 69; Doc. 31-3 at 53, 109-110). For the 2012-2013 school year, S.M. invoked L.C.'s McKay Scholarship rights and L.C. began attending Peace by Piece in August of 2012. Doc. 41-1 at 23 ¶ 4; Tr. 237 (Doc. 31-2 at 39). During this time, L.C. was not a student in the HCSD. Tr. 1204 (Doc. 31-8 at 69).

In addition to changing the matrix score, Mr. Caulkins directed that the HCSB transport L.C. to Peace by Piece, even though L.C. was no longer enrolled in the HCSD. Doc. 1-1 ¶ 20; Tr. 604 (Doc. 31-4 at 138); Doc. 41-1 at 23 ¶ 5. While the HCSB does provide transportation to some students who attend school out of district, these students remain enrolled in the HCSD. Tr. 1205-06 (Doc. 31-8 at 70-71). In those cases, the HCSB has determined that it cannot meet that particular student's educational needs and therefore places the student in a school in Lee County, Florida that better serves that student. Tr. 1206-07 (Doc. 31-8 at 71-72). Ordinarily, the HCSB does not provide transportation to students enrolled in the McKay Scholarship program. Tr. 1207 (Doc. 31-8 at 72)[15]

---

[15] Ms. Kelley testified that the school district does not transport students who are not enrolled in the district due to insurance and funding reasons. Tr. 1204-05 (Doc. 31-8 at 69-

As of April 2013, Mr. Caulkins effectively was relieved of his responsibilities as the ESE director for the HCSB, and Lucinda Kelley was selected to replace him as the new ESE director.   Doc. 1-1 ¶ 22; Tr. 622, 1247-48 (Doc. 31-4 at 156; Doc. 31-9 at 22-23).   Although Ms. Kelley did not formally begin her position until July 1, 2013, the superintendent granted her all decision-making authority regarding budget and ESE operations in April 2013.   Doc. 1-1 ¶ 22; Tr. 1248 (Doc. 31-9 at 23).

In April 2013, Ms. Kelley discovered through an audit of the transportation department that L.C., a student who was on McKay Scholarship and not a HCSD student, was receiving transportation by the HCSB.   Doc. 1-1 ¶ 23; Tr. 1204 (Doc. 31-8 at 69).   She spoke to the assistant superintendent and discovered that Mr. Caulkins had filled out a form to provide transportation for L.C. but did not disclose that L.C. was a McKay student.   Tr. 1272-73 (Doc. 31-9 at 47-48).[16]   Ms. Kelley determined that the school board needed to discontinue the transportation.   Tr. 1204 (Doc. 31-8 at 69).

On May 23, 2013, the HCSB sent a letter to S.M. informing her that the HCSB would discontinue transportation to and from Peace by Piece following the conclusion

---

70).   Additionally, the McKay scholarship guidelines provide that transportation is not within the district's purview.   Tr. 1205 (Doc. 31-8 at 70).

[16] Mr. Caulkins testified that he met with the superintendent and director of operations and requested the school provide transportation to L.C. because he did not think that the HCSD was providing FAPE to L.C., and that providing transportation to him was "the right thing to do."   Tr. 604 (Doc. 31-4 at 138).   The ALJ did not specifically address Mr. Caulkins' testimony.   *See* Doc. 1-1.   The Court does not find Mr. Caulkins' testimony entirely credible for several reasons.   First, he testified that an IEP team meeting, in which the mother was present, occurred to change the matrix score; however, S.M. testified to the contrary.   Tr. 381, 624-26, 629-39 (Doc. 31-3 at 109; Doc. 31-4 at 158-60, 163-173).   Second, he testified that S.M., and not the district, purchased an iPad for L.C.   Tr. 641-42 (Doc. 31-4 at 175-76).   Third, he had difficulty recalling many specific details.   *See* Tr. 577-659 (Doc. 31-4 at 111-193).

of the school year on June 6, 2013.   Doc. 1-1 ¶ 24; Doc. 41-1 at 24 ¶ 6; Tr. 1205 (Doc. 31-8 at 70).   S.M. was upset with the HCSB's decision to discontinue L.C.'s transportation to Peace by Piece and contacted Ms. Kelley and other school officials in an attempt to reinstate the transportation.   Doc. 1-1 ¶ 25; Tr. 288-89, 1208-09 (Doc. 31-3 at 16-17; Doc. 31-8 at 73-74).   The HCSB maintained its position, however, that it was inappropriate to offer the transportation to L.C. when he was not enrolled in the school district.   Tr. 1209 (Doc. 31-8 at 74).

S.M. decided to forego L.C.'s McKay scholarship rights following the 2012-2013 school year.   Doc. 1-1 ¶ 26; Doc. 41-1 at 24 ¶ 6.   S.M. then re-enrolled L.C. in the HCSD on July 25, 2013.   Doc. 1-1 ¶ 26; Doc. 41-1 at 24 ¶ 8.   On August 8, 2013, the HCSB provided S.M. with an IEP meeting notice for L.C., which was scheduled for August 14, 2013.   Doc. 1-1 ¶ 27; Ex. 1 HFSH000037 (Doc. 39-1 at 37).

Prior to the IEP meeting in August 14, 2013, Ms. Kelley discussed with Ms. Beerom and Susan Brusso, whether it would be appropriate to evaluate L.C.   Tr. 1216 (Doc. 31-8 at 81).[17]   They determined that L.C. needed to be evaluated "at some point . . . in the near future," but that "the timing did not seem right to broach the subject too strongly with [S.M.]."   *Id.*   Ms. Kelley testified that because S.M. felt strongly about returning L.C. to Peace by Piece, "we wanted to start off good. We wanted him to get into his classroom, and we wanted to have some positive things happen with him, and then try to get the parent's permission for evaluation."   *Id.*

---

[17] Susan Brusso is the Interpreter of Instructional Implications of Evaluation for the district.   Ex. 1 HFSH000022 (Doc. 1-1 at 22).

Ms. Beerom could not independently recall whether the IEP team discussed reevaluation during the IEP meeting, but she remembered that it was not needed at that time, in part "because it was not due . . . until January [2014]."   Tr. 1051-1156, 1115, 1170 (Doc. 31-7 at 111-116, 175; Doc. 31-8 at 35).

On August 14, 2013, the HCSD held an initial IEP meeting to discuss L.C.'s return to the district.   Doc. 41-1 at 24 ¶ 9.   S.M. and her legal counsel attended the meeting, along with all the necessary participants from the HCSD.   *Id.*; Doc. 1-1 ¶ 29.   At this meeting, school officials brought a draft IEP that they had developed pursuant to the quality IEP guidelines established by the FDOE in order to have a starting point to discuss L.C.'s needs and goals for the upcoming school year.   Tr. 1119-21 (Doc. 31-7 at 179-181).   The HCSD assured S.M. that the draft IEP could be adjusted as additional information was received and L.C.'s needs became known.   Tr. 444, 1135 (Doc. 31-3 at 172; Doc. 31-7 at 195).   S.M. did not make any objections regarding the draft IEP.   Tr. 1135 (Doc. 31-7 at 195).

During the August 14, 2013 meeting, the IEP team determined that it lacked sufficient information from Peace by Piece to develop an appropriate IEP for L.C.; therefore, the team suspended the meeting in order to obtain information from Peace by Piece regarding L.C.'s present levels of performance.   Doc. 1-1 ¶ 30; Tr. 392, 1114-16 (Doc. 31-3 at 120; Doc. 31-7 at 174-176); Ex. 1 HFSH000021.   Moreover, S.M. agreed to provide L.C.'s evaluations for OT and PT and L.C.'s PT prescription to the school district.   Doc. 1-1 ¶ 31; Ex. 1 HFSH000021 (Doc. 39-1 at 21).

Prior to the second IEP meeting in August 2013, L.C.'s classroom teacher at

the time, Ms. Feickert, contacted Peace by Piece to obtain information on L.C.'s progress there. Doc. 1-1 ¶ 33; Tr. 1342, 1346, 1386-87 (Doc. 31-10 at 10, 14, 54-55). Ms. Feickert spoke with L.C.'s teacher at Peace by Piece and also received L.C.'s educational file for the 2012-2013 school year.   Tr. 1342; 1345 (Doc. 31-10 at 10, 13); Ex. 7 HFSH000067-71 (Doc. 39-1 at 67-71); Ex. 9 HFSH000072-76 (Doc. 39-1 at 72-76); Ex. 10 HFSH000077-80 (Doc. 39-1 at 77-80).   L.C.'s progress reports from Peace by Piece stated there were several tasks that L.C. could complete.   Doc. 1-1 ¶ 34; Tr. 1396-1405 (Doc. 31-10 at 64-73).   After Ms. Feickert independently assessed L.C., however, she was unable to replicate some of the same reported levels of performance. *Id.*

With the new information on hand, the August 14, 2013 IEP team reconvened its meeting on August 29, 2013.   Doc. 1-1 ¶ 32; Tr. 392 (Doc. 31-3 at 120).   S.M., her legal counsel, and all other required school participants again were present.   *Id.* Ms. Feickert shared her re-assessment of L.C.'s skills with the IEP team during the writing of the August 2013 IEP.   Doc. 1-1 ¶ 34; *see* Ex. 1 HFSH000015 (Doc. 39-1 at 15).   S.M. also provided the evaluations and the OT prescription for L.C.   Tr. 1134-35 (Doc. 31-7 at 194).

On August 30, 2013, IEP team members, Susan Brusso, Ms. Feickert, Ms. Puletti, and guidance counselor Beth Lutkenhaus reevaluated L.C.'s educational matrix score.   Doc. 1-1 ¶ 36; Ex. 1 HFSH000022, HFSH000026 (Doc. 39-1 at 22, 26). Based on this reevaluation, L.C.'s matrix score was changed again from 255 to 254; this information is included in the August 29 2013 IEP.   Doc. 1-1; Ex. 1

HFSH000026-29 (Doc. 39-1 at 26-29).

The ALJ found that two of L.C.'s IEPs fall within the two-year statute of limitations period preceding the filing of a due process complaint: 1) the September 22, 2011 IEP; and 2) the August 29, 2013 IEP.   Doc. 1-1 ¶ 39.   Therefore, the Final Order made specific in-depth factual findings concerning each of the IEPs.   *Id.*   The Court finds it appropriate to similarly do so here.   Plaintiffs' argument that the January 25, 2011 IEP falls within the statute of limitations and all other arguments will be addressed below.

### a.  September 22, 2011 IEP

On September 1, 2011, the HCSB provided S.M. with an IEP meeting notice. Ex. 3 HFSH000050 (Doc. 39-1 at 50).   The IEP team held the meeting on September 22, 2011.   Ex. 3 HFSH000041(Doc. 39-1 at 41).

The September 22, 2011 IEP team determined that priority educational needs for L.C. were: "[s]pecial therapy for gross and fine motor skills and communication, special instruction for self-care, and social skills, very small group instruction for readiness skills, [and] continuous assistance with communication device[.]" Ex. 3 HFSH000042 (Doc. 39-1 at 42).   Accordingly, the IEP provided for 60 minutes per week of ST, 60 minutes per week of PT, 30 minutes of OT, continuous assistance with communication devices, daily assistance with self-care skills, and "very small group instruction for readiness/academics, social and communication skills."   Ex. 3 HFSH000047 (Doc. 39-1 at 47).

While enrolled in Mr. Serra's classroom, L.C. had an aide, or paraprofessional,

Jennifer Fletcher, assigned to him.   Tr. 803, 994 (Doc. 31-5 at 144; Doc. 31-7 at 54). Although his IEP did not call for a one-one-one paraprofessional, it is common for a paraprofessional to be provided for a classroom, but then actually spend more time with one student compared to others.   Tr. 1173, 1202-03 (Doc. 31-8 at 38, 67-68). Initially, Mr. Serra included L.C. in the classroom instruction; however, he later instructed Ms. Fletcher to work more closely with L.C. as L.C. was not capable of completing the same work as other students in the classroom.   Tr. 1004 (Doc. 31-7 at 64).

Ms. Fletcher worked with L.C. on activities, such as using flashcards, documented L.C.'s success rate, and provided the data to Mr. Serra.   Tr. 999 (Doc. 31-7 at 59).   Ms. Fletcher did not see Mr. Serra do any one-on-one instruction with L.C., but she was not aware what he did when she was absent from the classroom. Tr. 1004 (Doc. 31-7 at 64).

Ms. Olson, a speech language pathologist, worked with L.C. from September 2010 through March 2012.   Tr. 776, 784 (Doc. 31-5 at 117, 125).   She first began working with L.C. approximately one year before the September 22, 2011 IEP meeting.   Tr. 783 (Doc. 31-5 at 124).   At that time, Ms. Olson determined L.C. needed functional communication.   Tr. 784 (Doc. 31-5 at 125).   Ms. Olson prepared a memorandum concerning a continuum of care for L.C. that set out the levels for L.C.'s language therapy covering the time period from September 2010 through March 2012.   Doc. 1-1 ¶ 41; Tr. 781-82 (Doc. 31-5 at 122-123); Ex. 111 HFSH000337-HFSH000341.   The continuum of care documented the progress that Ms. Olson

noted in L.C. initially recorded in activity data log sheets.   Tr. 848 (Doc. 31-5 at 189).

The continuum of care memorandum shows that L.C. was capable of educational progress, but had to re-learn certain tasks that he had previously mastered.   Doc. 1-1 ¶ 42; Ex. 111 HFSH000339 (Doc. 39-2 at 138-41).   For example, in December 2010, L.C. had mastered the colors "red, yellow, green, blue and orange with 100% accuracy given three choices."   Ex. 111 HFSH000338 (Doc. 39-2 at 138). But by September 2011, L.C. "was reintroduced to colors and shapes through the use of large, plastic multi-colored 'buttons,' achieving less than 60% accuracy on these skills."   Ex. 111 HFSH000339 (Doc. 39-2 at 139).   Ms. Olson noted that it could not be determined "if the decrease in accuracy was [the result of L.C.'s] shunt that had malfunctioned over the summer (surgery was required to repair this), or if [L.C.] had just forgotten these skills."   Id.   Ms. Olson testified that she believed L.C.'s regression at this time was due to the July 2011 shunt surgery, rather than any decrease in effectiveness of his activities.   Tr. 839-40 (Doc. 31-5 at 180).[18]   After L.C.'s shunt surgery, she observed he had a surge in learning again and he "flourished."   Tr. 840, 854 (Doc. 31-5 at 181, 195).

To help with L.C.'s functional communication, the School Board purchased and programmed for him an iPad with an application called Proloquo2go.   Ex. 111 HFSH000339 (Doc. 39-2 at 138-41); Ex. 24 HFSH000133-36 (Doc. 39-1 at 133-36).[19]

---

[18]   L.C.'s shunt broke and was replaced in July 2011. Ex. 1 HFSH000041 (Doc. 39-1 at 41); Ex. 5 HFSH000063 (Doc. 39-1 at 63).

[19]   Proloquo2go is symbol-supported communication application installed in augmented alternative communication ("AAC") devices, such as the iPad, to provide a "voice" to people who cannot speak or have difficulty speaking.   See Tr. 879, 1291 (Doc. 31-6 at 22; Doc. 31-9 at 66); Ex. 111 HFSH000339 (Doc. 39-2 at 139).

L.C. received the iPad on October 6, 2011.   Ex. 111 HFSH000339 (Doc. 39-2 at 139). From then on, L.C. made significant educational progress.   Doc. 1-1 ¶ 43; Tr. 798-802 (Doc. 31-5 at 139-143).   Ms. Olson noted that "[b]y October 20, [2011], L.C. was able to use Proloquo2go with verbal cues and minimal hand-over-hand assistance to greet and tell the therapist and one other student L.C.'s name, age, grade, town, and school name."   Ex. 111 HFSH000339 (Doc. 39-2 at 139).   By March, 2012, L.C. was able to consistently ask for "more" to keep an activity going and use a hand signal of "all done" when he was tired of an activity.   Ex. 111 HFSH000340 (Doc. 39-2 at 140). Additionally, Ms. Olson stated that L.C. had "made strides forward in functional communication using the application Proloquo2go."   *Id.*

Ms. Olson explained to Ms. Fletcher L.C.'s use of the iPad for functional language and encouraged her to use the iPad throughout the day with L.C.'s teachers and students during all activities.   Ex. 111 HFSH000339 (Doc. 39-2 at 139).   In addition to Ms. Olson, L.C.'s teachers and aides used the iPad to work on L.C.'s communication.   Tr. 1002 (Doc. 31-7 at 62).   For instance, L.C. used the iPad to say "good morning," "thank you" and "please."   *Id.*   During this time-frame, L.C. also benefitted from interaction with his peers, both disabled and non-disabled.   Tr. 1011 (Doc. 31-7 at 71).

### b.  August 29, 2013 IEP

Members of the IEP team, including the school psychologist, L.C.'s service providers, L.C.'s classroom teachers, and HCSD staffing specialists provided input into developing the 2013 IEP and IEP goals for L.C.   Tr. 1019-20, 1344, 1346 (Doc.

31-7 at 79-80; Doc. 31-10 at 12, 14); Ex. 1 HFSH000022 (Doc. 39-1 at 22).    In preparing for the August 29, 2013 IEP, the HCSB officials spoke to L.C.'s teacher, surveyed L.C.'s would-be environment, and ascertained L.C.'s ST, OT, and PT needs. Tr. 1212 (Doc. 31-8 at 79).

Also in preparation for the August 29, 2013 IEP, Ms. Feickert conducted a thorough examination of L.C.'s past IEPs.    Doc. 1-1 ¶ 49; Tr. 1396-1405 (Doc. 31-10 at 64-73).   She also contacted L.C.'s teacher at Peace by Piece to determine what skills L.C. had learned during the previous year.    Doc. 1- 1 ¶ 49; Tr. 1346 (Doc. 31-10 at 14).   Additionally, although it was not his most recent school, Ms. Feickert contacted L.C.'s teachers and paraprofessionals at his elementary school, Country Oaks Elementary, to get a better understanding of L.C.'s abilities.   Tr. 1346 (Doc. 31-10 at 14).

In addition, Ms. Feickert independently assessed L.C.'s skills by comparing his skill levels with the results from Peace by Piece.    Doc. 1-1; Tr. 1396-1405 (Doc. 31-10 at 64-73).   For example, Ms. Feickert tested L.C.'s ability to independently emit 7 out of 10 new "mands"[20] with the item present across two people in two settings, "tact"[21] 3 out of 15 objects independently in an array of three, and identify body parts. Tr. 1396-1397, 1399-1400 (Doc. 31-10 at 64-65, 67-68).   Despite indication in the progress reports from Peace by Piece that L.C. mastered those skills, he was not able to replicate the same skills when initially enrolled in Ms. Feickert's classroom.   Doc.

---

[20] A "mand" is a request by the child.   Tr. 805 (Doc. 31-5 at 146).
[21] To "tact" is to label or name something.   Tr. 125 (Doc. 31-1 at 125).

1-1 ¶ 50; 1396-1397, 1399-1400 (Doc. 31-10 at 64-65, 67-68).

The HCSD relied, in part, on the information from Peace by Piece regarding L.C.'s present levels of performance in developing the August 2013 IEP.   Tr. 838, 1116-1118, 1122 (Doc. 31-5 at 179; 31-7 at 176-178; 182).   Ms. Feickert also relied on her independent assessments of L.C., and Ms. Beerom, the school psychologist, also relied on Dr. Moon's 2008 report.   Tr. 1025 (Doc. 31-8 at 70).

As noted, during the 2013-2014 school year, L.C. was enrolled in Ms. Feickert's classroom.   Tr. 1341 (Doc. 31-10 at 9).   Ms. Feickert is a certified ESE teacher and received the 2012-2013 Golden Apple award given annually to the teacher of the year in HCSD.   Tr. 1395 (Doc. 31-10 at 63); Ex. 31 HFSH000144.   The student/adult ratio in Ms. Feickert's classroom at the time was 3 to 1, which included Ms. Feickert and two paraprofessionals.   Tr. 1371 (Doc. 31-10 at 39).   No single paraprofessional was assigned exclusively to L.C.; however, the HCSB hired an additional paraprofessional in Ms. Feickert 's classroom to help with L.C.   Doc. 1-1 ¶ 59, Tr. 1372 (Doc. 31-10 at 40).

Ms. Feickert kept L.C.'s IEPs and copies of the occupational therapy plan, physical therapy plan of care, and healthcare plan in her classroom.   Tr. 1379, 1382-83, 1393 (Doc. 31-10 at 47, 50-51, 61).   L.C.'s IEP states he was to receive 30 minutes per week of OT and 30 minutes per week of ST.   Tr. 1376-78 (Doc. 31-10 at 44-46).   L.C.'s speech language therapist, Ms. Puletti, was working with him on communication skills through several avenues, including pointing, and using sign language, picture exchange cards, and the iPad.   Tr. 1295 (Doc. 31-9 at 70).   Ms.

Feickert routinely spoke with L.C.'s speech language therapist regarding his progress and the activities and skills on which the therapist was working.   Tr. 1376-77 (Doc. 31-10 at 44-45).   Ms. Feickert routinely implemented the activities that the speech therapist was using with L.C. throughout the week, so he, in actuality, received more than the 30 minutes provided for in his IEP.   Tr. 1377 (Doc. 31-10 at 45).

Ms. Feickert also routinely communicated with L.C.'s OT therapist, Elizabeth Palma, and implemented the activities and therapies in conjunction with L.C.'s classroom instruction throughout the day.   Tr. 1377-79, 1410 (Doc. 31-10 at 45-47).   Ms. Palma attended L.C.'s classroom during his OT therapy, and Ms. Feickert observed and replicated the therapies with L.C.   Tr. 1378-79 (Doc. 31-10 at 46).

At the beginning of the school year, Toni Couse, a physical therapist, met with L.C. in Ms. Feickert's classroom.   Tr. 1381 (Doc. 31-10 at 49).   She drafted a physical plan of care and provided it to Ms. Feickert.   Tr. 1383 (Doc. 31-10 at 51); Ex. 12 HFSH000084 (Doc. 39-1 at 84).   Ms. Couse observed L.C. using his KidWalk and made any necessary adjustments to his leg straps.   Tr. 1383-84 (Doc. 31-10 at 51-52).   Ms. Feickert and the paraprofessionals in her classroom incorporated physical therapy "throughout the day."   Tr. 1384 (Doc. 31-10 at 52).   For example, L.C. spent time each day using his KidWalk in the classroom.   Ex. 4 HFSH000058-61;[22] Tr. 1422 (Doc. 31-10 at 90).   L.C. also used the KidWalk while working on a SMART board, which projects objects onto a large white touch screen, allowing L.C. to use his hands and fingers to match objects and items on the board with instruction

_____

[22] Although the photo collage is designated as Exhibit 5 in the exhibit list (Doc. 39 at 1), it was filed as Exhibit 4 (Doc. 39-1 at 58-60).

from Ms. Feickert.   Tr. 1415-16, 1422 (Doc. 31-10 at 83-84, 90).   Moreover, Ms. Feickert, worked daily with L.C. on the physical therapy home exercise program that L.C. mother provided.   Tr. 1384-85 (Doc. 31-10 at 52-53); Ex. 34 HFSH000145-149 (Doc. 39-1 at 145-49).

Ms. Feickert worked on L.C.'s communication goals by teaching him new "mands" or requests using both sign language and his iPad.   Tr. 1368-69 (Doc. 31-10 at 36).   Ms. Feickert also incorporated L.C.'s commands and communication goals into his everyday life through the process of generalization.   Tr. 1435 (Doc. 31-10 at 103).   For example, one occupational activity that Ms. Feickert integrated into the classroom was "job skills."   Doc. 1-1 ¶ 55; Tr. 1416 (Doc. 31-10 at 84).   Ms. Feickert had her students complete different "jobs," such as recycling and shredding paper. Id.   In one instance, L.C. was responsible for popping tops from cans.   Id.   This job integrated work on L.C.'s fine motor skills, required group cooperation with other students, and required L.C. to focus and complete the task.   Tr. 1416-17 (Doc. 31-10 at 84-85).

In Ms. Feickert's classroom, L.C. received one-on-one and small group instruction throughout the day.   Tr. 1147, 1409 (Doc. 31-8 at 12; Doc. 31-10 at 77). His day began with a forty-minute session of one-on-one instruction either with a paraprofessional, Ms. Rubble, or with Ms. Feickert.   Tr. 1409 (Doc. 31-10 at 77).   He also received the visual accommodations listed in the IEP.   Tr. 1374 (Doc. 31-10 at 42).   Ms. Feickert worked daily with L.C. on his iPad using several programs that the HCSD had programmed for L.C.'s use.   Tr. 1385-86, 1389 (Doc. 31-10 at 53-54,

57).   One of these programs is the DTT Pro, which Ms. Feickert used to work on L.C.'s receptive language, or identification of things like objects and colors.   Tr. 1390-1392 (Doc. 31-10 at 58-60).

L.C. participated in an inclusion classroom for a portion of each day, in which he spent time interacting with his non-disabled peers in adaptive physical education as well as during lunch.   Tr. 1147, 1407-08 (Doc. 31-8 at 12; Doc. 31-10 at 75-76). L.C. also interacted on a daily basis with non-disabled peers who volunteered as helpers in Ms. Feickert's classroom.   Tr. 1357-58 (Doc. 31-10 at 25-26).   Ms. Feickert also invited older general education students to her classroom each Friday for lunch – an event she termed "lunch munch."   Tr. 1357 (Doc. 31-10 at 25).   She testified L.C. "lights up" when he interacts with the "lunch munch" students, especially the girls.   *Id.*   Additionally, L.C. spent time each day in adaptive physical education ("PE") class, in which students, including L.C., participated in physical activities and sports adapted to their physical limitations.   Tr. 1360-61 (Doc. 31-10 at 28-29).

Ms. Feickert also placed L.C. on a bathroom schedule.   Tr. 1350 (Doc. 31-10 at 18).   L.C. had a similar schedule at home and at Peace by Piece the prior school year.   Tr. 207, 1351 (Doc. 31-2 at 7; Doc. 31-10 at 19).   Ms. Feickert or one of the paraprofessionals in her classroom would take L.C. to the bathroom at regularly scheduled intervals throughout the day to minimize accidents.   Tr. 1350 (Doc. 31-10 at 18).

Ms. Feickert and her paraprofessionals tracked L.C.'s progress daily through

by collecting data on his successes and failures for each task.   Tr. 1406 (Doc. 31-10 at 74).   She maintained a notebook in her classroom with such data for each student, including for L.C.   Tr. 1406, 1425-26 (Doc. 31-10 at 74, 93-94).

## III.   Legal Standard

"Congress enacted the IDEA 'primarily to make public education available to handicapped children and to make such access meaningful.'"   *Donald B. By & Through Christine B. v. Bd. of Sch. Comm'rs of Mobile Cty., Ala.*, 117 F.3d 1371, 1373 (11th Cir. 1997) (quoting *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 891 (1984)). The IDEA provides federal assistance to states that educate children with disabilities.   *Endrew F.*, 137 S. Ct. at 993.   To receive the funds, states must provide FAPE to all eligible children.   *Id.* (citing 20 U.S.C. § 1412(a)(1)).   "The instruction offered must be 'specially designed' to meet a child's 'unique needs' through an '[IEP]'".   *Endrew F.*, 137 S. Ct. at 999 (emphasis omitted) (quoting 20 U.S.C. §§ 1401(29),(14)).

In essence, the IEP is the roadmap to the child's academic and functional advancement, "constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth."   *Id.* at 999 (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv)).   The IEP must be drafted in compliance with a detailed set of procedures, which emphasize collaboration among parents and educators and careful consideration of the child's individual circumstances.   20 U.S.C. § 1414.

Every IEP must include "a statement of the child's present levels of academic

achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be measured. 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(III). The IEP also must describe the "special education and related services . . . that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

If the parents of the child are dissatisfied with the IEP, they are entitled to an impartial due process hearing to be conducted by the State or local educational agency. *Walker Cty. Sch. Dist. v. Bennett*, 203 F.3d 1293, 1294 (11th Cir. 2000) (citing 20. U.S.C. § 1415(f)). "Any party aggrieved by the result of the administrative proceedings in the state system" may bring a civil action in a district court. 20 U.S.C. § 1415(i)(2)(A). The court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(c).

The Supreme Court has established a two-part standard of review for suits brought under the IDEA:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these two requirements are met, the

State has complied with the obligations imposed by Congress and the courts can require no more.

*Doe v. Ala. State Dep't of Educ.*, 915 F.2d 651, 655 (11th Cir. 1990) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-07 (1982).

Under the procedural prong of *Rowley*, this Court must assess whether the HCSB has complied with the procedures set forth in the IDEA, "including the creation of an IEP that conforms to the requirements of the Act." *Weiss by Weiss v. Sch. Bd. of Hillsborough Cty.*, 141 F.3d 990, 994 (11th Cir. 1998) (citing *Doe,* 915 F.2d at 658). A procedural defect in the IEP does not automatically entitle a party to relief. "In evaluating whether a procedural defect has deprived a student of a FAPE, the Court must consider the impact of the procedural defect, and not merely the defect *per se.*" *Id.* Thus, for Plaintiffs to prove that L.C. was denied FAPE because of alleged procedural defects, they must show harm to L.C. as a result of the alleged violations. *Id.* at 997.

Under the substantive prong of *Rowley*, the Court must determine whether L.C. received adequate educational benefits that were "reasonably calculated to enable [him] to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001. Indeed, in the Supreme Court's view, a "student offered an educational program providing merely more than *de minimis* progress from year to year can hardly be said to have been offered an education at all." *Id.* at 1001. Nonetheless, the IDEA does not require states to develop IEPs that "maximize the potential of handicapped children." *Rowley*, 458 U.S. at 189.

Whether an IEP provided a [FAPE] "is a mixed question of law and fact subject to de novo review." *Sch. Bd. of Collier Cty., Fla. v. K.C.*, 285 F.3d 977, 982 (11th Cir. 2002). Nevertheless, "the administrative decision in an IDEA case is entitled to due weight and the court must be careful not to substitute its judgment for that of the state educational authorities. Still, . . . the extent of the deference to be given to the administrative decision is left to the sound discretion of the district court which must consider the administrative findings but is free to accept or reject them." *Bennett*, 203 F.3d at 1297-98. "To that end, administrative factfindings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." *M.M. ex rel. C.M. v. Sch. Bd. of Miami-Dade Cty., Fla.*, 437 F.3d 1085, 1097 (11th Cir. 2006) (quoting *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1314 n.5 (11th Cir. 2003)). The Court "must be careful not to substitute its judgment for that of the state educational authorities." *Bennett*, 203 F.3d at 1297 (citing *Rowley*, 458 U.S. at 176).

## IV. Burden of Proof

Plaintiffs bear the burden of proof to establish by a preponderance of the evidence that the IDEA was violated, thereby denying FAPE to the student. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *Loren F.*, 349 F.3d at 1313. In this case, L.C.'s parent, S.M., on behalf of her child is objecting to the challenged IEPs and therefore bears the burden of proof.

## V. Analysis

As an initial matter, Plaintiffs argue that the ALJ incorrectly applied the

statute of limitations with respect to the IEPs.   Doc. 40 at 7-8.   Accordingly, the Court first will address this issue before proceeding to analyze the IEPs at issue.

Plaintiffs assert that the January 2011 IEP fell within the two-year statute of limitations.   *Id.* at 8.   Indeed, Plaintiffs consistently argue that the HCSB failed to provide FAPE for the 2009-2012 school years, when the only IEPs at issue are the September 22, 2011 IEP (the 2011-2012 school year) and the August 29, 2013 IEP (2013-2014 school year).   *See e.g.*, Doc. 40 at 8.

A parent shall request an impartial due process hearing no later than two years from the date the parent knew or should have known about the alleged action that forms the basis of the due process hearing request.   20 U.S.C. § 1415(f)(3)(c); 34 C.F.R. 300.507(a)(2); Fla. Admin. Code 6A-6.03311(9)(b).   This timeline does not apply if the parent was prevented from requesting the hearing due to:

(i)     specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or

(ii)    the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

20 U.S.C. § 1415(f)(3)(c).

Plaintiffs filed the due process request on September 3, 2013.   Doc. 41-1 at 24 ¶ 9.   S.M. attended the January 25, 2011 IEP meeting and provided her parental input.   Ex. 43 HFSH000184 (Doc. 39-1 at 184).   S.M. knew, or at least should have known, as of January 25, 2011 of the alleged procedural and substantive violations related to this IEP.   The ALJ correctly found that S.M. did not argue or establish any facts showing that either exception to the two-year statute of limitation is

applicable.  Doc. 1-1 ¶ 82.  Nor does S.M. do so here.  Instead, she argues that because the January 25, 2011 IEP was in effect until a new IEP was developed on September 22, 2011, it fell within the two-year statute of limitations.  Doc. 42 at 5. This argument misapplies the standard, however.  Accordingly, the Court recommends that the only IEPs at issue are those from September 22, 2011 and August 29, 2013.

> a.  *September 22, 2011 IEP & August 29, 2013 IEP*

In this case, the Court concludes that the ALJ's findings of fact and conclusions are entitled to great deference.  Although the ALJ did not specifically cite to the record or specifically refer to each witness' testimony, upon de novo review of the record, it is clear to the Court that the ALJ's Final Order shows careful consideration of the evidence and firm grasp of the facts and issues at hand.  Accordingly, the Court recommends adopting the ALJ's findings and conclusions with respect to the IDEA claim.

To summarize, Plaintiffs point to certain conflicts in the testimony that indicate the IEPs were not perfect.  *See generally* Doc. 40.  In contrast, "perfection is not required." *Loren F.,* 349 F.3d at 1312 (citing *K.C.,* 285 F.3d at 982).  The Supreme Court recently reiterated that "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal." *Endrew F.,* 137 S. Ct at 999 (citing *Rowley,* 458 U.S. 206-207).  What is reasonable depends on the particular child and his unique needs. *Id.*  Any educational program for the child "must be appropriately ambitious in light of circumstances" and must offer "the chance to meet challenging objectives." *Id.*

In this case, given L.C.'s medical challenges, his IEPs primarily focused on the

development of skills that would aid him in becoming more independent.   These skills included ambulation, feeding himself, cleaning himself, interaction with others, and most importantly communication.   *See* Ex. 1 HFSH HFSH000009-23 (Doc. 39-1 at 9-23); Ex. 3 HFSH000040-57 (Doc. 39-1 at 42).   These goals are consistent with L.C.'s most then-most current psychoeducational evaluation of L.C. conducted by Dr. Moon, who recommended that L.C. participate in an inclusion classroom, receive supplemental one-on-one instruction, and the use of alternative communication devices to aid L.C. in improving his ability to communicate.   Ex. 15 HFSH000094 (Doc. 39-1 at 94).

The September 22, 2011 IEP team determined that priority educational needs for L.C. were: "Special therapy for gross and fine motor skills and communication, special instruction for self-care, and social skills, very small group instruction for readiness skills, [and] continuous assistance with communication device[.]"   Ex. 3 HFSH000042 (Doc. 39-1 at 42).   Accordingly, the IEP provided weekly for 60 minutes of ST, and 60 minutes of PT, 30 minutes of OT; continuous assistance with communication devices; daily assistance with self-care skills; and "very small group instruction for readiness/academics, social and communication skills."   Ex. 3 HFSH000047 (Doc. 39-1 at 47).

The record shows that the September 22, 2011 IEP was reasonably calculated to enable L.C. to receive an educational benefit that would allow him to make appropriate progress in light of his unique circumstances.   *Endrew F.*, 137 S. Ct. at 1001.   The ALJ correctly found that Ms. Olson's continuum of care memorandum "provides a credible and contemporaneous evaluation of L.C.'s educational progress

during the September 22, 2011, IEP meeting."   Doc. 1-1 ¶ 41.   As noted, Ms. Olson's memorandum shows that, on October 2011, the HCSD provided L.C. with an iPad and programmed it with the Proloquo2go application to help with his functional communication.   Ex. 111 HFSH000339 (Doc. 39-2 at 138-41); Ex. 24 HFSH000133-36 (Doc. 39-1 at 133-36).   L.C.'s teachers and aides used the iPad to work with his communication skills, and L.C. received continuous assistance with his iPad.   Tr. 1002 (Doc. 31-7 at 62).   Ms. Olson explained to L.C.'s paraprofessional and teachers the importance of using the iPad for L.C.'s functional language and the need to use the iPad throughout the day.   Ex. 111 HFSH000339 (Doc. 39-2 at 139).

The iPad allowed L.C. to make significant progress toward functional communication during the 2011-2012 school year.   Tr. 798-802 (Doc. 31-5 at 139-143).   Indeed, in the Fall of 2011, L.C. was able to use the Proloquo2go with verbal cues and minimal hand-over-hand assistance to greet and tell people his name, age, grade, town, and school name.   Ex. 111 HFSH000339 (Doc. 39-2 at 139).   By Spring of 2012, L.C. was able to consistently ask for "more" to keep an activity going and using a hand signal of "all done" when he was tired of an activity.   Ex. 111 HFSH000340 (Doc. 39-2 at 140).   L.C. also was able to use the iPad to communicate with people, other than Ms. Olson, such as say "good morning," "thank you" and "please."   Tr. 1002 (Doc. 31-7 at 162).   He was able to communicate with his classmates using the iPad by answering their questions with "yes" or "no."   Tr. 1000 (Doc. 31-7 at 60).   For a nonverbal and nonvocal child such as L.C., he made "strides forward in functional communication" using the iPad and Proloquo2go.   Tr. 1012

(Doc. 31-7 at 72).   Given his circumstances, for the 2011-2012 school year, L.C. was given the chance to meet, and did meet, challenging objectives.   *Endrew F.*, 137 S. Ct. at 1000.

Moreover, S.M., Ms. Olson, and Ms. Fletcher all testified that L.C. was making progress and advancements while enrolled in the HCSD during the 2011-2012 school year.   Tr. 95-96, 798-802, 805-07, 812-13, 811, 830 (Doc. 31-1 at 95; 31-5 at 139-143, 146-148, 153-154, 171).   In addition to his functional communication, L.C. also benefitted from interaction with his peers, both disabled and non-disabled during this time-frame.   Tr. 1011 (Doc. 31-7 at 71).   For instance, Ms. Fletcher testified that he "grew socially very much [by] being with the other students and them interacting with him."   *Id.*

Relevant to this IEP, Plaintiffs argue that the ALJ erred in failing to consider evidence that Ms. Olson had a very busy schedule to dedicate enough time to L.C. Doc. 40 at 11.   It is true that Ms. Olson testified that she had a very busy schedule and she missed some therapies with L.C.   Tr. 778, 793 (Doc. 31-5 at 119, 134).   She determined, however, that L.C. was one of those students who needed her the most, so she always tried to compensate for any missed sessions by either meeting L.C. in the lunchroom or during other unscheduled times.   Tr. 793, 801, 844 (Doc. 31-5 at 134, 142, 185).   Plaintiffs also argue that the ALJ failed to consider testimony that Ms. Fletcher, L.C.'s paraprofessional, was unqualified to work with L.C.   Doc. 40 at 13-14.   Both S.M. and Ms. Olson testified that Ms. Fletcher did not have the extensive training needed to be effective with L.C.   Tr. 89, 803 (Doc. 31-1 at 89; Doc.

31-5 at 144).   The Court does not recommend that Ms. Olson's busy schedule or the lack of additional training by L.C.'s paraprofessional, Ms. Fletcher, denied L.C. of FAPE.   Instead, the record clearly establishes that L.C. made significant progress during the 2011-2012 school year in light of his unique circumstances.

Plaintiffs argue that the September 22, 2011 IEP was defective in that it contained overlapping goals with prior IEPs.   Doc. 40 at 23.   For instance, LC's January 25, 2011 IEP and September 22, 2011 IEP include the same goal that "LC will use augmentative/alternative communication skills with assistance to specify action words in order to direct or describe action in activities given 10 trials with 80% accuracy over 4 consecutive therapy sessions."   Ex. 3 HFSH000043 (Doc. 39-1 at 43; Ex. 43 HFSH000190 (Doc. 39-1 at 190).   Dr. Winston and Dr. Terrasi testified that repeating the same goals in IEPs suggests either that the goals are inappropriate or the teaching method is ineffective.   Tr. 140, 170 (Doc. 31-1 at 140, 170).

In contrast, the Court recommends that in light of L.C.'s circumstances, the repetition of same goals was reasonable.   Both Ms. Olson's continuum of care memorandum and testimony demonstrate that L.C. experienced regression in his abilities following a shunt surgery in July 2011.   Ex. 111 HFSH000339 (Doc. 39-2 at 139); Tr. 839-40 (Doc. 31-5 at 180-181).   The regression was due to the surgery rather than any decrease in effectiveness of his activities.   Tr. 839 (Doc. 31-5 at 180). Accordingly, the fact that September 2011 IEP re-addressed some of the goals from January 2011 was appropriate in light of L.C.'s regression following his surgery.

Next, Plaintiffs argue that the HCSB falsified educational data regarding L.C.

educational abilities.   Doc. 40 at 3-7.   Plaintiffs rely on the record evidence that L.C.'s levels of performance reported from 2009-2011 were internally inconsistent. *Id.*   As noted above, L.C.'s 2009 and 2010 IEPs, which are not for review before the Court, reported greater abilities than L.C. possessed.   Ex. 63 HFSH000237 (Doc. 39-2 at 37); Ex. 62 HFSH000228 (Doc. 39-2 at 28).   This inaccurate information was due, in part, to assistance given to L.C. by his teacher, Ms. Torgler, during the assessments.   By January 25, 2011, L.C. was relocated to Mr. Serra's classroom. Tr. 702, 737; Ex. 43 HFSH000184-85 (Doc. 39-1 at 84-85).   There is no evidence that L.C. received similar assistance once removed from Ms. Torgler's classroom.   It is not surprising then that, compared to his earlier IEPs, L.C.'s January 25, 2011 IEP showed decreased abilities.

The undersigned recommends that the prior inconsistent results did not result in a denial of FAPE to L.C. for the 2011-2012 and 2013-2014 school years. Competent substantial evidence shows that once the HCSD determined the 2009-2010 data was unreliable, it sent Ms. Samuels to reassess L.C. and determine his accurate academic standing.   Ms. Samuels participated in the January 2011 IEP and did not offer any objections or opinions that the district was not meeting L.C.'s needs at that time.   Tr. 726-727, 734 (Doc. 31-5 at 67-68, 75).   Instead, the IEP team, which included Ms. Samuels, determined that additional data was not warranted at that time, and that special education and related services that were then being provided were appropriate.   Tr. 729; Ex. 43 HFSH000198 (Doc. 39-1 at 198). Because the record does not support it, the Court does not recommend a finding that

HCSB falsified any data related to the September 22, 2011 and August 29, 2013 IEPs.

Turning specifically to the August 29, 2013 IEP, the ALJ determined that this IEP was prepared in conformity with IDEA procedural safeguards.  Doc. 1-1 ¶ 85. The ALJ discounted Plaintiffs' claim that the HCSB violated the IDEA by preparing the initial draft IEP.  *Id.*   The ALJ determined that the IEP team, including S.M., with legal counsel present, understood that the initial document presented at the August 14, 2013 meeting was a draft.  *Id.*   Moreover, the IEP team continued the initial IEP meeting to gather additional information from Peace by Piece and S.M., and incorporated the additional information into the final IEP.  *Id.*   The ALJ concluded that S.M. "clearly . . . had an opportunity to participate and develop a final IEP."  *Id.*[23]   The Court finds no reason to recommend disturbing these findings.

Competent, substantial evidence shows that the HCSB brought together an IEP team, with the appropriate members, and addressed L.C.'s skills and ways to help him develop functional communication, receive an educational benefit, and determine his placement in the school.   The IEP team members gathered

---

[23] At the outset, the ALJ found as follows:

> [T]he undersigned finds that it is questionable whether or not S.M. participated in the IEP team meeting on August 29, 2013, and the subsequent writing of the IEP in good faith. As stated earlier, before the IEP was finished, S.M. had determined to file for due process hearing because the parent wanted L.C. to attend the private school and for the school district to provide transportation. Having decided that S.M. wanted L.C. to attend the private school, the undersigned finds that S.M. did not fully participate in the development of the IEP. One specific area of concern is that S.M. did not raise the issue of conducting another re-evaluation of L.C.

Doc. 1-1 ¶ 45.   The conclusion of the ALJ is supported by S.M.'s own testimony.   Tr. 442 (Doc. 31-3 at 170).

information from L.C.'s past HCSD IEPs, the Peace by Piece IEP, testing data from Peace by Piece, as well as interviews with L.C.'s prior teachers from Peace by Piece and his prior elementary school.    Furthermore, the IEP team had the benefit of Ms. Feickert's comparative assessment of L.C.'s skills based on the Peace by Piece progress reports.    Additionally, S.M., along with counsel, had the opportunity to participate and did not offer any objections or disagreements regarding any of the stated goals.   Tr. 1133 (Doc. 31-7 at 193).

Ms. Feickert's testimony, as fully laid out above, clearly demonstrates that during this relevant time frame, L.C. was receiving a meaningful educational benefit through the continued development of functional communication in different settings, as well as integration of speech, physical, and occupational therapy in the everyday classroom experience.    Ms. Feickert monitored L.C.'s progress and routinely discussed with L.C.'s therapists how to improve and carry forward the different therapies into everyday classroom experience.   Tr. 1391, 1426, 1376-79.   In the limited time that L.C. attended Ms. Feickert's classroom, he made progress in his behavior and academics.   Tr. 1348-49, 1402-03.

The following arguments that the Court addresses concern the August 29, 2013 IEP.    The August 29, 2013 IEP identifies the use of augmented alternative communication ("AAC") to help develop L.C.'s communication skills.    Ex. 1 HFSH000012-13 (Doc. 39-1 at 12-13).    Plaintiffs argue the IEP is procedurally defective because AAC was not defined.   Doc. 40 at 38.   AAC is "a term . . . used to cover augmentative high and low tech devices, . . . such as picture exchanges, pointing, gesturing, [and] facial expressions as a way to communicate."   Tr. 1293 (Doc. 31-9 at 68).   In addition to the iPad, Ms. Feickert used picture cards, static

board, or hand signals to teach L.C. different ways of communicating, particularly in a situation when the iPad is nonfunctional.   Tr. 1423-24 (Doc. 31-10 at 91-92).   The IEP was not procedurally defective for failure to define AAC.

Three of the stated goals for L.C. in the August 29, 2013 IEP are that L.C. would use AAC to designate "again," or "more," "stop," and "all done."   Ex. 1 HFSH000012-13 (Doc. 39-1 at 12-13).   Plaintiffs argue these goals were inappropriate given that L.C. already showed mastery of those goals.   Doc. 40 at 38. While L.C. previously showed mastery of those goals, on retesting by Ms. Feickert, he was unable to consistently use these signals, like "more," in the appropriate context.   Tr. 1348 (Doc. 31-10 at 16).   Therefore, with Ms. Feickert's input in the IEP meeting, it was an appropriate goal to address so that L.C. could learn to generalize the tasks.

Special education services listed in the IEP include "[v]ery small group instruction in social, independent, and communication skills," and 30 minutes per week of direct communication therapy.   Ex. 1 HDSH000018 (Doc. 39-1 at 18). Although L.C. required help with almost all daily activities, such as toileting, the IEP does not provide for a one-on-one paraprofessional dedicated solely to L.C.   The HCSB, however, did hire an additional paraprofessional specifically for L.C.'s classroom.   Tr. 1371 (Doc. 31-10 at 39).   With the small adult-to-student ratio in L.C.'s classroom, L.C. always had immediate access to an adult for help with his daily activities, such as toileting.   Tr. 1138 (Doc. 31-7 at 198).   Academically, it was important for L.C.'s independent functioning that he receive only supplemental one-on-one instruction to avoid L.C. being attached to one person all the time.   Tr. 1138, 1373 (Doc. 31-7 at 198, 31-10 at 41).   Ms. Feickert testified that L.C. needed to be

able to provide similar responses to different people.   Tr. 1373 (Doc. 31-10 at 41). Because L.C. seemed to show more progress as he developed rapport with people, it was important for him to generalize the skills he learned with one person to the rest of the world.   Tr. 1403, 1435 (Doc. 31-10 at 71, 103).

Although the IEP does not include PT services, Ms. Feickert regularly incorporated PT in her classroom.   Moreover, since the time of the final hearing, Plaintiff states that the HCSB has reinstated direct PT for L.C.   Doc. 40 at 24.

Plaintiffs argue that despite evidence that the HCSB believed L.C. needed additional evaluations, the HCSB failed to properly assess L.C. for his baseline academic achievement and functional performance levels.   Doc. 40 at 17-18, 34-37. They further argue the ALJ erred in his legal conclusion that the lack of reevaluation was not significant to L.C.'s ability to receive an educational benefit.   *Id.* at 17. Moreover, Plaintiffs fault the ALJ for not addressing conflicts in the testimony between Ms. Kelley and Ms. Beerom.   *Id.* at 17-18.

The educational agency must ensure that a reevaluation of each child with a disability is conducted: (i) if there is a determination that the child's educational or related services needs, including improved academic achievement and functional performance, warrant a reevaluation; or (ii) if the child's parents or teacher requests a reevaluation.   20 U.S.C. § 1414(a)(2)(A).   The student must be reevaluated "at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary."   20 U.S.C. § 1414(a)(2)(B)(ii).   The educational agency must obtain parental consent prior to conducting any reevaluation.   20 U.S.C. § 1414(c)(3).   "Consent" is defined as:

(a) The parent has been fully informed of all information relevant to the activity for which consent is sought . . .;

(b) The parent understands and agrees in writing to the carrying out of the activity for which his or her consent is sought, and the consent describes that activity and lists the records (if any) that will be released and to whom; and

(c)(1) The parent understands that the granting of consent is voluntary on the part of the parent and may be revoked at any time.

34 C.F.R. § 300.9.

L.C. received an initial evaluation that determined his placement, when on October 8, 2008, Catherine Moon, Ph.D. conducted a psycho-educational evaluation of L.C. on behalf of the HCSD.   Doc. 1-1 ¶ 10; Ex. 15 HFSH000089-95 (Doc. 39-1 at 89-95).   On January 25, 2011, the IEP team, including S.M., determined that a new evaluation of L.C. was not necessary.   Ex. 51 HFSH000202 (Doc. 39-2 at 2).   The team determined that the special and education services that were being provided were adequate and that L.C.'s new IEP appropriately addressed his needs.   *Id.* S.M. signed an "Informed Notice That Additional Data for Re-evaluation are Not Warranted" form, and understood that if a parent signs such a form, the school district would rely upon it.   Ex. 51 HFSH000202 (Doc. 39-2 at 2); Tr. 375.   L.C.'s next evaluation was due January 2014.

In the meantime, upon L.C.'s return to the HCSD and prior to the August 2013 IEP team meetings, school officials discussed whether it would be appropriate to reevaluate L.C.   Tr. 1216 (Doc. 31-8 at 81).   S.M. did not participate in these discussions.   Ms. Kelley testified that although the school officials determined that L.C. needed to be evaluated "at some point . . . in the near future," they chose not to

broach the subject with S.M. immediately in order to re-establish a level of trust with her, considering the difficulties relating to the decision not to continue transporting L.C. to Peace by Piece.   Ms. Beerom could not independently recall whether the IEP team discussed L.C.'s reevaluation during the IEP meeting, but she remembered that it was not needed at that time, "part of it could have been because it was not due . . . until January [2014]."   Tr. 1051-56, 1115, 1170 (Doc. 31-7 at 111, 175; Doc. 31-8 at 35).   As a result, Ms. Kelley's and Ms. Beerom's testimonies were not necessarily conflicting.

Plaintiffs also argue the ALJ erred in failing to consider evidence of L.C.'s regression in functional and communication skills following his return to the HCSB from Peace by Piece.   Doc. 40 at 27-30.   The ALJ, in fact, considered and discussed the evidence, albeit without discussing every witness's testimony on the subject. Doc. 1-1 ¶¶ 50-51.

Ms. Scheetz, L.C.'s music therapist, testified that L.C. made progress while he was attending Peace by Piece, such as by having "fewer of the self-stimulations."   Tr. 764 (Doc. 31-5 at 105).   After returning to HCSD, she noticed his self-stimulation behaviors increased by 25%.   Tr. 766 (Doc. 31-5 at 107).   S.M. also testified that L.C.s "personality has regressed" and that L.C. was more introverted once he stopped going to Peace by Piece.   Tr. 318 (Doc. 31-3 at 46).   Ms. O'Connell, L.C.'s home health care nurse, likewise testified that she noticed a difference in L.C. while he was attending Peace by Piece.   Tr. 190 (Doc. 31-1 at 190).   She testified that although he could not speak, "his communication was much better."   Id.   She also testified that

by the end of his time at Peace by Piece, L.C. was feeding himself independently.   Tr. 191 (Doc. 31-1 at 191).

As noted earlier, the Peace by Piece progress reports also included several activities that L.C. was able to perform, which Ms. Feickert could not replicate in her classroom.   Although the ALJ did not discuss the testimony of Ms. Scheetz, Ms. O'Connell, or S.M. about L.C.'s regression, the ALJ considered L.C.'s regression from the progress reports by Peace by Piece.   The ALJ concluded that Ms. Feickert "credibly offered three reasons explaining the difference in L.C's performance" between Peace by Piece and her initial assessment:

> a.     First, she noted L.C.'s performance was affected by the fact that L.C. was unfamiliar with Ms. Feickert and may have been uncomfortable performing tasks.   This explanation was consistent with testimony from S. M. and other therapists that L.C.'s performance improves as the student develops a rapport with a new therapist or teacher;
>
> b.     Second, Ms. Feickert credibly explained that the difference in L.C.'s performance between the skills shown at the private school and her initial testing were based on differences in the testing.   For example, in identifying 17 objects out of 25 objects, the list of the 25 objects may have varied; thus, causing a reduction in items identified; and
>
> c.     Finally, the third reason for L.C.'s different test results between her initial assessment and the private school assessment is that L.C. has shown difficulty in generalizing tasks.   For example, Ms. Feickert explained that L.C. may say "hello" to classmates in a small group, but has difficulty applying that skill to greeting students entering the classroom.   Ms. Feickert's testimony here credibly explains why it is appropriate in the current IEP to re-address skills that L.C. showed proficiency [in the private school].

Doc. 1-1 ¶ 52.

The   Court   recommends   the   ALJ's   conclusion   and   credibility   finding   is

supported by competent substantial evidence.   Tr. 54-57, 208-09, 1367, 1402-03 (Doc. 31-1 at 54-57; Doc. 31-2 at 10-11; Doc. 31-10 at 35, 70-71).   Ms. Feickert, S.M. and Ms. O'Connell also testified that L.C. shows more progress as he develops rapport with people.   Tr. 54-57, 208-09, 1402-03 (Doc. 31-1 at 54-57; Doc. 31-2 at 10-11; Doc. 31-10 at 70-71).[24]   Likewise, Ms. Beerom testified that it is important to build rapport with L.C. prior to any assessment.   Tr. 1096-97 (Doc. 31-7 at 156-57). Therefore, the Court finds no merit in Plaintiffs' argument that the ALJ failed to consider L.C.'s regression.

Plaintiffs also argue that the HCSB failed to provide extended school year services.   Doc. 40 at 26, 40-41.   Pursuant to 34 C.F.R. § 300.306(a)(1), "[e]ach public agency must ensure that extended school year services are available as necessary to provide FAPE."   Section 300.306 (a)(2) further explains that [e]xtended school year services must be provided only if a child's IEP Team determines, on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child."   The August 29, 2013 IEP provides for extended school year services from June 9, 2014 to June 27, 2014.   Ex. 1 HFSH 000019 (Doc. 39-1 at 19).   During this period, L.C. was to receive special instruction on communication, independent living, and social skills daily; consultation for communication skills weekly; and, therapy for fine motor skills for thirty minutes per

---

[24] S.M. testified that L.C. "knows how to manipulate very well" and "he'll just pretend like he's unable to do anything."   Tr. 54-57 (Doc. 31-1 at 54-57).   Ms. O'Connell echoed S.M.'s testimony and further testified that she experienced much more effort and progress from L.C. once she was able to build rapport with him.   Tr. 208-09 (Doc. 31-2 at 10-11).

week.  *Id.*   S.M. and her counsel were present at the IEP meeting and neither objected to the extended school year services recommended.   Nor was any mention made at the administrative hearing that the extended school year services were inappropriate.   The undersigned recommends that Plaintiffs have failed to meet their burden of proof with respect to this issue.

Plaintiffs further contend the ALJ erred in finding that Ms. Puletti, L.C.'s then current speech therapist, was qualified to work with L.C.   Doc. 40 at 30.   Ms. Puletti was an associate speech and language pathologist with the HCSD and has a bachelor's degree.   Tr. 1321 (Doc. 31-9 at 96).   Ms. Puletti worked under the supervision of Judy Lapp, who has a master's degree.   Tr. 1185, 1187, 1223 (Doc. 31-8 at 50, 52, 88).   Ms. Kelley also oversees the speech language pathologists.   Tr. 1188 (Doc. 31-8 at 53).

Ms. Puletti helped participate in developing the goals in L.C.'s August 29, 2013 IEP.   Tr. 1321 (Doc. 31-9 at 96).   Ms. Puletti discussed her goals with her supervisors, Tracy Dalton (another master's level speech language pathologist) and Judy Lapp, to make sure that she was using appropriate goals to meet L.C.'s needs. Tr. 1322 (Doc. 31-9 at 97).   While working with L.C., Ms. Puletti collaborated with L.C.'s teacher and provided ideas, suggestions, and lesson plan feedback on ways the teacher could incorporate AAC and strategies to help L.C. to communicate.   Tr. 1325 (Doc. 31-9 at 100).

Under section 1012.44 of the Florida Statutes, school districts that qualify for

a sparsity supplement[25] may provide speech-language services by baccalaureate degree level persons under the direction of a certified speech-language pathologist with a master's degree or higher.   Fla. Stat. § 1012.44.   *See also* Fla. Admin. Code. 6A-6.03012(7)(d)(1) ("Speech therapy services provided by a speech-language associate as specified . . . must be under the direction of a certified or licensed speech-language pathologist with a master's degree or higher in speech-language pathology.").   Districts must submit a plan to the FDA for approval before implementation of such plan.   Fla. Admin. Code. 6A-6.03012(7)(d)(2).

Mr. Caulkins testified that he never submitted a Speech Language Associate ("SLA") plan while he was ESE director.   Tr. 602 (Doc. 31-4 at 136).   Ms. Kelley testified that the responsibility to submit a SLA plan to the FDOE is not with the ESE Director, but rather falls under the Human Resources Department.   Tr. 1186 (Doc. 31-8 at 51).   Ms. Kelley testified that the HCSD has a FDOE approved SLA plan.   Tr. 1183 (Doc. 31-8 at 48).   She testified she did not have a copy of the approved SLA Plan because it would be retained at the state level.   Tr. 1185 (Doc. 31-8 at 50).   Exhibit 55 in the record is the FDOE Technical Assistance Paper Question and Answers Regarding Speech-Language Impaired Associate Certification.   Ex. 55 HFSH000212220 (Doc. 39-2 at 11-20).   An Appendix lists the "Florida Schools Districts That Qualify for the Sparsity Supplement Based on Florida Education Finance Program (FEFP)" and specifically lists Hendry County.   Tr.

---

[25] *See* Section 1011.62(7), Florida Statutes, for a determination of the sparsity supplement.

1184 (Doc. 31-8 at 49); HFSH000219.   Ms. Kelley testified that this appendix is proof that Hendry County qualified for the sparsity supplement, and therefore is able to use a baccalaureate degree level person under the direction of a certified speech-language pathologist with a master's degree or higher to work with its HCSB students.   Tr. 1184 (Doc. 31-8 at 49).   She testified that once the plan is submitted it does not have to be resubmitted, and that HCSD has passed numerous audits from the Florida Department of Education with respect to their speech pathologists.   Tr. 1184-85 (Doc. 31-8 at 49-50).

Plaintiffs state that on December 16, 2013, they filed a Verified Motion to Supplement the Record with the DOAH "based on information not made relevant until the HCSB presented misleading testimony and the information was relevant to prevent the ALJ from making an incorrect finding of fact based on the false testimony by the HCSB." Doc. 40 at 31.   Further, "the supplement was based on information from the FDOE that the HCSB did not have a FDOE approved Speech and Language Associate (SLA) Plan." Id. at 31.   Plaintiffs argue that at the time of the hearing, a SLA Certification plan for the Hendry County School Board did not exist. Id.   The Court, however, only has the evidence before it, as it was presented by Ms. Kelley and Exhibit 55.   Accordingly, the Court is unable to recommend that Ms. Puletti was unqualified to work with L.C.

Lastly, although Plaintiffs argue so, the fact that some witnesses, who were no longer employed by the HCSB, testified that they did not feel the district was meeting L.C.'s needs is not dispositive of whether the district provided FAPE to the student.

The IDEA does not require states to develop IEPs that "maximize the potential of handicapped children." *Rowley*, 458 U.S. at 189.   Indeed, even Dr. Terrasi, the director of Peace by Piece, the private school S.M. preferred L.C. attend, testified that she did not think that Peace by Piece met all of L.C.'s educational needs.   Tr. 910 (Doc. 31-6 at 53).   This was particularly because Peace by Piece did not offer OT or PT.   Tr. 929 (Doc. 31-6 at 72).

## VI.   Plaintiffs' Other Claims

The ALJ made findings of fact and conclusions of law related to Plaintiffs' other claims, including S.M.'s retaliation claim.   Doc. 1-1 ¶ 67-73, 93-106.   The parties stipulated to the jurisdiction of the DOAH to hear S.M.'s section 504 of the Rehabilitation Act claims to the extent those claims are co-extensive with the IDEA claims.   Doc. 41-1 at 25.   The HCSB has stated that it previously intended to file a Motion for Final Summary Judgment on all of Plaintiffs' claims in this matter. Doc. 35 at 2.   Given that the Court bifurcated the IDEA claim, the Court considered only the IDEA issues here; however, Plaintiffs' other claims are based in large part on the resolution of the IDEA issues.   Accordingly, the undersigned recommends the district judge permit the parties to file limited briefing on the remaining claims so as to reach a global resolution of this matter.   Alternatively, a settlement conference with the non-assigned United States Magistrate Judge may be beneficial in resolving the remaining claims.

## VII.   Conclusion

Given L.C.'s medical challenges, his IEPs primarily focused on the

development of skills that would aid him in becoming more independent.   These skills include ambulation, feeding himself, cleaning himself, and most importantly communication.   To that end, the Court recommends competent substantial evidence demonstrates that L.C.'s IEPs have been developed with the specific goals of developing these skills.   *Id*.   The September 22, 2011 and August 29, 2013 IEPs were reasonably calculated to enable L.C. to make progress appropriate in light of his circumstances.   *Endrew F.*, 137 S. Ct. at 1001.   The Court has been careful "not to substitute its judgment for that of the state educational authorities."   *Bennett*, 203 F.3d at 1297 (citing *Rowley*, 458 U.S. at 176).   Accordingly, the Court recommends that the HCSB has provided a FAPE to L.C. for the 2011-2012 and 2013-2014 school year.

ACCORDINGLY, it is respectfully

**RECOMMENDED:**

1.   With respect to Count I, Claim for Relief Under Individuals with Disabilities Education Act, the Final Order of the Administrative Law Judge be affirmed, and Judgment should be entered on behalf of Defendant, the Hendry County School Board and against the Plaintiff, S.M., on behalf of L.C.

2.   The district judge permit the parties to file limited briefing on the remaining claims so as to reach a global resolution of this matter.   Alternatively, the parties be ordered to attend a settlement conference with the non-assigned United States Magistrate Judge in an attempt to resolve the remaining claims.

**DONE** and **ENTERED** in Fort Myers, Florida on this 27th day of July, 2017.

CAROL MIRANDO
United States Magistrate Judge

Copies:
Counsel of Record